**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

WRIGHT ELECTRIC, INC.,
WILLIAM G. VICE, and
BILLY JOE PORTER,

Plaintiffs,

v.

MINNESOTA STATE BOARD OF ELECTRICITY; JOHN SCHULTZ, Executive Secretary of the Minnesota State Board of Electricity;
CITY OF WEST ST. PAUL; and RICHARD BRADLEY, Inspector of the City of West St. Paul,

Defendants.

Civil No. 00-1457 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' SUMMARY JUDGMENT MOTIONS**

---

Gregg J. Cavanagh, CAVANAGH LAW OFFICE, 13277 94th Avenue North, Maple Grove, MN, 55369, for plaintiffs.

Michele M. Owen, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, 525 Park Street, Suite 200, St. Paul, MN, 55103-2106, for defendants Minnesota Board of Electricity and John Schultz.

Julie Fleming-Wolfe, FLEMING-WOLFE LAW OFFICE, 1010 Degree of Honor Building, 325 Cedar Street, St. Paul, MN, 5501, for defendant City of West St. Paul.

Michael D. Hutchens and Bradley J. Lindeman, MEAGHER & GEER, P.L.L.P., 4200 Multifoods Tower, 33 South Sixth Street, Minneapolis, MN, 55402, for defendant Richard Bradley.

FILED MAR 31 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. MAR 31 2002
DEPUTY CLERK

Plaintiffs Wright Electric, Inc. ("Wright Electric"), William G. Vice, and Billy Joe Porter brought this action against defendants seeking a declaration by the Court that Minnesota Statute § 326.242(5) and Minnesota Rule 3800.3500(11A) are invalid and unenforceable because they are preempted by The Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*. The Minnesota law and rule at issue require licensed electricians to supervise no more than two unlicensed persons, including apprentices, performing electrical work at a particular jobsite. In their Complaint, plaintiffs also seek to enjoin defendants from enforcing this 2:1 ratio requirement. This matter is now before the Court on cross-motions for summary judgment.[1] The Court concludes that Wright Electric's apprenticeship program does not constitute an ERISA employee welfare benefit plan. In addition, the Court finds that even if the apprenticeship program were deemed an ERISA plan, Minn. Stat. § 326.242(5) and Minn. Rule 3800.3500(11A) would not be preempted by ERISA. The Court therefore grants defendants' motion for summary judgment and denies plaintiffs' motion for summary judgment.

[1] Plaintiffs Wright Electric, Vice and Porter have joined in one motion for summary judgment. Defendants Minnesota Board of Electricity, John Schultz, City of West St. Paul, and Richard Bradley have also joined in one motion for summary judgment. In addition, Richard Bradley has filed an independent motion for summary judgment, seeking that he be dismissed from the action for grounds other than those asserted in defendants' collective motion for summary judgment.

## BACKGROUND

### A. The Parties, the Electrical Act and the Violation

The Minnesota Electrical Act (the "Electrical Act"), Minn. Stat. §§ 326.01 *et seq.* (2000), regulates the conduct of licensees in the performance of electrical work in Minnesota. The Electrical Act prohibits an unlicensed person from performing electrical work unless supervised by a licensed electrician who is employed by the same employer. Minn. Stat. § 326.242, subd. 5(a)-(c). The Minnesota Rules promulgated in accordance with the Electrical Act set a mandatory ratio requiring no more than two unlicensed workers to be supervised by one licensed electrician at a jobsite. Minn. Rule 3800.3500(11A). The Electrical Act also requires electrical contractors to maintain records demonstrating compliance with this supervision ratio. Minn. Stat. § 326.242(5)(c).

Wright Electric is a licensed electrical contractor that performs residential, commercial, and industrial electrical work in Minnesota and other states using both licensed and unlicensed workers. It currently employs 12 licensed electricians and 28 unlicensed apprentices. Plaintiffs William Vice and Billy Joe Porter are licensed electricians working for Wright Electric.

Defendant Minnesota State Board of Electricity (the "Board") is the electrical licensing authority in Minnesota responsible for administering and enforcing the Electrical Act. Defendant John Schultz is the Executive Secretary of the Board, who oversees the enforcement activities of the Board Staff. Defendant Richard Bradley was

the Electrical Inspector for defendant City of West St. Paul during the relevant time period and the person responsible for enforcing the Electrical Act within West St. Paul.

In May 1999, Wright Electric received a warning letter from the Board concerning an alleged violation of the Electrical Act at a job site. In March 2000, Wright Electric was performing electrical work in connection with a construction project in the city of West St. Paul. On March 8, 2000, Bradley issued misdemeanor citations to Wright Electric employees Porter and Vice, who were working on the project.[2] The two were cited for violating Minn. Stat. § 326.242(5) because they were supervising more than two unlicensed apprentices at the job site in West St. Paul.

**B. Wright Electric's Apprenticeship Program**

Plaintiffs are claiming that the provisions of the Electrical Act and the corresponding rules requiring contractors, such as Wright Electric, to ensure that one licensed electrician supervises no more than two unlicensed apprentices at a jobsite, are preempted by ERISA. Defendants contend that the Wright Electric apprenticeship program is not an ERISA plan. In order to evaluate these claims, it is necessary to describe the details of Wright Electric's apprenticeship program.

Wright Electric has had a training program for its unlicensed apprentice electricians in place since 1989. It established a formal apprenticeship program in 1994

---

[2] The cases against Porter and Vice were continued for dismissal and if the two are not convicted of the same or a similar offense by May 4, 2001, the cases against them will be dismissed. In the event that either of them is convicted of the same or a similar offense, they will be required to pay $200 in court costs and the case will be revived.

that was approved by the Division of Voluntary Apprenticeship of the Minnesota Department of Labor and Industry ("DOL"). The DOL requires that registered apprentices complete 8,000 hours of work in an approved area over 4 years and obtain 144 hours of "related instruction" each year, which means educational, classroom, or correspondence training in the applicable trade.

The Wright Electric apprenticeship program is a five-year program that consists of both on-the-job training as well as classroom instruction. Each apprentice in the program receives at least 1,500 hours of on-the-job training per year and a minimum of 144 hours of classroom instruction per year. The on-the-job training component of the program consists of journeymen electricians instructing apprentices in how to perform various tasks and checking their electrical work.

The classroom instruction for the Wright Electric apprenticeship program is provided by the Construction Education Foundation of Minnesota (the "Foundation"). The Foundation is a training partner of the Minnesota Chapter of Associated Builders and Contractors, Inc. ("Minnesota ABC"), a trade association representing construction contractors, suppliers, and affiliates.[3] The Foundation offers a five-year classroom curriculum for electrical apprentices, known as the Wheels of Learning ("WOL"). The

---

[3] Wright Electric is a member of Minnesota ABC.

WOL is a competency-based, modular curriculum, which can be taught in phases or by specific skill activity.[4]

The classroom portion of the Wright Electric apprenticeship program is funded through a trust operated by the Foundation and NCCER.[5] The trust, however, does not fund any part of the "on-the-job" training component of the apprenticeship program. Apprentices are paid for their on-site electrical work, where they receive training, just as any other employee – through wages paid directly from Wright Electric's general assets. Wright Electric contributes seven cents for each hour worked by its field personnel to the trust and payments are made to the trust on a quarterly basis.[6] These contributions are used to pay the tuition costs of the WOL classes that Wright Electric employees enroll in. When Wright Electric apprentices enroll in WOL classes, the Foundation deducts the amount of the tuition for the class from the Wright Electric Foundation trust account.

Although Wright Electric makes quarterly contributions to the Foundation, it has often run its Foundation account at a deficit. In those instances, Wright Electric has been billed directly for the shortfall and has made a lump sum payment to the Foundation trust out of the company's general assets to pay for the WOL tuition of its apprentices. Wright Electric then deducts the cost of the WOL tuition from the paycheck of the apprentice

---

[4] The WOL is developed and maintained by the National Center for Construction Education and Research ("NCCER"), based in Gainesville, FL. NCCER is the training partner of Associated Builders and Contractors, Inc., Minnesota ABC's national affiliate.

[5] Before the Foundation was established, WOL classes were paid through ABC membership dues.

[6] Wright Electric determined the "cents per hour" contribution rate based on the number of apprentices it believed would participate in classroom training in a year.

taking the course on a pro-rata basis over the course of the year. After the apprentice successfully completes that particular WOL course, Wright Electric refunds to the apprentice half of the tuition of the course, presumably from its general assets.

Wright Electric's apprenticeship program does not contain any specific requirements concerning the ratio of licensed to unlicensed workers at a jobsite. Instead, Wright Electric makes the decision about how many licensed workers should supervise an unlicensed apprentice on a case-by-case basis.

## DISCUSSION

Wright Electric contends that the state statute and rule providing that licensed electricians shall supervise no more than two unlicensed workers on a job site are preempted by ERISA. Wright Electric argues that its apprenticeship program constitutes an ERISA welfare benefit plan and that as a result the preemption clause of ERISA, 29 U.S.C. § 1144(a), is applicable. Accordingly, Wright Electric moves for a permanent injunction to enjoin defendants from enforcing the ratio requirement and a declaratory judgment that the statute and rule are invalid and unenforceable. Defendants, however, argue that Wright Electric's apprenticeship program does not constitute an ERISA plan and that even if the program is an ERISA plan, the state ratio requirement is not preempted because the requirement does not have the necessary "connection with" an ERISA plan. Defendants further argue that the ratio requirement is an exercise of traditional state police power that was not intended to be preempted by ERISA.

## I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir. 1981).

## II. Existence of an ERISA Plan

As an initial matter, the Court must determine whether the Wright Electric apprenticeship program is an ERISA employee benefit plan. The Eighth Circuit has instructed that "[w]here federal subject matter jurisdiction is based on ERISA, but the evidence fails to establish the existence of a plan, the claim must be dismissed for lack of subject matter jurisdiction." *Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 256 (8th Cir. 1994). The Eighth Circuit treats the existence or non-existence of an ERISA plan as a jurisdictional issue. *Id.* The determination of whether an ERISA plan exists is a mixed question of law and fact. *Id.*

ERISA defines an employee benefit plan as either "an employee welfare benefit plan or an employee pension benefit plan." 29 U.S.C. § 1002(3). An employee welfare benefit plan is "any plan, fund, or program . . . established or maintained . . . for the purpose of providing for its participants [specified] benefit[s]." *Id.* § 1002(1). These "benefits" include "apprenticeship or other training . . . ." *Id.* However, not every employee benefit is governed by ERISA. *Kulinski*, 21 F.3d at 256.

In discussing the standard that is to be applied when evaluating whether a benefit plan is an ERISA plan, the Eighth Circuit has explained that:

> The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits. Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather an employer's need to create an administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.

*Id.* at 257. In light of this standard, the Court finds that Wright Electric's apprenticeship program does not qualify as an ERISA plan. The administrative scheme employed by Wright Electric to administer its apprenticeship program consists of the type of simple and mechanical decisions that the Eighth Circuit has concluded do not justify ERISA status.

Wright Electric does not make the types of discretionary decisions, such as evaluating eligibility criteria or determining benefit levels, that are indications of a true ERISA plan. *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1322-23 (9th Cir. 1992) (explaining that "discretionary decision making by the plan's administrator that is the hallmark of an ERISA plan"). The Supreme Court in *Fort Halifax Packaging Co. v. Coyne*, 482 U.S. 1 (1987), explained in some detail its understanding of the "administrative realities" of employee benefit plans:

> An employer that makes a commitment systematically to pay certain benefits undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements.

*Id.* at 9. Wright Electric does not experience any of these administrative realities. The only eligibility determination that is made by Wright Electric in administering its plan is whether it intends to hire the potential electrical apprentice. After the apprentice is hired and enrolled in the program, only uncomplicated administrative decisions are made concerning benefit disbursements. Essentially, eligibility for tuition benefits and payment of tuition costs, the only apparent benefits of the program, are triggered by the single event of an apprentice enrolling in a WOL class. Wright Electric directs the

Foundation to pay the tuition costs of each apprentice who enrolls in a WOL training class. It then refunds to the apprentice half of the tuition cost of the WOL course after the apprentice has successfully completed the class. Based on its apparent habit of running its Foundation trust account at a deficit, it is also clear that Wright Electric does not monitor with any regularity the availability of funds for benefit payments. The Court therefore does not believe that the administrative decisions made by Wright Electric are the type of discretionary administrative decisions that Congress had in mind for true ERISA plans.

The Court is also convinced that Wright Electric's apprenticeship program is not an ERISA plan because of the manner in which it is funded. 29 U.S.C. § 1103(a) provides that "all assets of an employee benefit plan shall be held in trust by one or more trustees." Wright Electric attempts to stretch this principle beyond its intended limit with its apprenticeship program. The Supreme Court has explained that a company may not defray the costs of an employee benefit plan from its general assets. *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 326-27 (1997) ("*Dillingham*"). That is essentially what is occurring with Wright Electric's apprenticeship program. The only assets that are "held in trust" are the funds deducted from employee wages. While those funds are intended to fully fund the tuition costs of apprentices enrolled in WOL classes, the Foundation trust often runs deficits and cannot cover the tuition costs of the courses. Wright Electric then simply makes lump sum payments to the Foundation from its general assets to cover the shortfall. In addition, apprentices are required to fully reimburse Wright Electric for the tuition of the WOL

classes through pro-rated payroll deductions over the course of the WOL class. Only upon successful completion of the course will Wright Electric refund to the apprentice half of the tuition cost of the WOL course, presumably out of the general assets of the company. In reality then, the classroom training of the apprentices is simply paid from the assets of the company, after those funds are passed through the Foundation trust. Further, no portion of the "on-the-job" training component, which makes up more than ninety (90) percent of the apprenticeship program, is funded through the Foundation trust.[7] This type of funding scheme is simply not the kind that Congress intended to sanction through ERISA.

The Court also notes that true ERISA plans normally maintain a balance of funds that are used to sustain the continued payment of benefits over time. *Massachusetts* v. *Morash*, 490 U.S. 107, 115-16 (1989) ("the distinguishing feature of most of these benefits is that they accumulate over a period of time and are payable only upon the occurrence of a contingency outside of the control of the employee"). This is an important component of most ERISA plans because it protects against financial mismanagement by the employer and ensures that plan benefits are not fully dependent on the employer's financial condition. *Id.* at 115 ("[i]n enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employee benefits from accumulated funds"). As explained above, the Wright Electric plan does not usually maintain a sufficient balance

---

[7] As noted above, the classroom component of the program consists of 144 hours per year, while the on-the-job training component consists of at least 1,500 hours per year.

in its trust account, but instead often runs the trust at a deficit. The funding realities of Wright Electric's plan do nothing to guard against some of the important concerns for which ERISA was originally enacted.

Finally, the Court finds it troubling that Wright Electric only elected to begin paying the classroom tuition for the WOL classes of its apprentices through the Foundation trust **after** Minnesota ABC advertised that doing so might permit contractors to receive a tax deduction and avoid state and local ratio supervision requirements, such as the one at issue in this case. A brochure circulated to Wright Electric by Minnesota ABC in 1998 explained the potential "benefits" of making contributions to a Foundation account stating that: "We believe that state and/or local government cannot impose a ratio if you offer, to your employees, an 'ERISA' protected training program, with regular contributions to a third party, like the CEF trust, as a method of funding the training." The cover letter attached to that brochure explained that using the Foundation trust would put contractors "in a strong position to challenge the minimum job site ratios imposed by the Board of Electricity and its inspectors." ERISA was not enacted to provide employers with a vehicle to deliberately avoid important state health and safety laws.

Given the basic, mechanical, and non-discretionary nature of the decisions that are made in the administration of the apprenticeship program, coupled with the manner in which the apprenticeship program is funded, the Court concludes that Wright Electric's program is not an ERISA plan. Defendants' motion for summary judgment is therefore granted and plaintiffs' Complaint must be dismissed for lack of subject matter jurisdiction. *Kulinski*, 21 F.3d at 256.

## III. ERISA Preemption

However, even if the Court were to determine that the Wright Electric apprenticeship program was an ERISA plan, it nonetheless would find that ERISA does not preempt the state ratio requirement.

ERISA includes an express preemption clause. Section 514(a) of ERISA provides that "[e]xcept as provided in subsection (b) of this section, the provisions of this [statute] shall supersede any and all State laws, insofar as they may now or hereafter relate to any employee benefit plan," covered by the statute. 29 U.S.C. § 1144(a). The Supreme Court has explained that applying the preemption clause requires a two-part inquiry: a state law[8] "relates to" a covered employee benefit plan for purposes of section 514(a) if it (1) has a "connection with" or (2) "reference to" such a plan. *Dillingham*, 519 U.S. at 324-25. "Where a State's law acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation . . . that 'reference' will result in preemption." *Id.*

In this case, the state ratio requirement functions irrespective of the existence of an ERISA plan. It does not act exclusively on ERISA plans and it does not expressly reference an ERISA plan. The law applies identically to ERISA and non-ERISA plans and is focused solely on whether the unlicensed electrical worker, regardless of whether

---

[8] For purpose of ERISA preemption, "state law" has been defined to include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). Minnesota Statute § 326.242 and Rule 3800.3500(11A) constitute "state law" for purposes of ERISA.

he is a participant or beneficiary of an ERISA plan, is supervised by the proper number of journeymen electricians. As a result, the state law and rule do not "reference" an ERISA plan for purposes of ERISA preemption analysis.

However, a state law that does not reference ERISA plans may still be preempted if it has a "connection with" ERISA plans. *Id.* The Court finds that even if the apprenticeship program were deemed to be an ERISA plan, the ratio requirement does not have a "connection with" an ERISA plan and would therefore not be preempted by ERISA.

To determine whether a state law has a "connection with" ERISA plans, courts are to look both to ERISA's objectives as a guide to the scope of the state law that Congress understood would survive and the nature of the law's effect on ERISA plans. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* ("*Travelers*"), 514 U.S. 645, 650-51 (1995). The Supreme Court has explained that in those cases where "federal law is said to bar state action in fields of traditional state regulation . . . we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* at 655 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Regulation of health and safety matters are those within the historic police powers of the States. *DeBuono v. NYSA-ILA Med. and Clinical Servs. Fund* ("*DeBuono*"), 520 U.S. 806, 814 (1997).

In addition, the Eighth Circuit has instructed that the following factors are to be considered when determining if state law is preempted by ERISA:

> (1) whether the state law negates an ERISA plan provision; (2) whether the state law affects relations between primary ERISA entities; (3) whether the state law impacts the structure of ERISA plans; (4) whether the state law impacts the administration of ERISA plans; (5) whether the state law has an economic impact on ERISA plans; (6) whether the preemption of the state law is consistent with other ERISA provisions; and (7) whether the state law is an exercise of traditional state power.

*Shea v. Esensten*, 208 F.3d 712, 718 (8th Cir. 2000). "In conducting the analysis, 'the court must still look to the totality of the statute's impact on the ERISA plan – both how many of the factors favor preemption and how heavily each individual factor favors preemption are relevant.'" *Wilson v. Zoellner*, 114 F.3d 713, 717 (8th Cir. 1997) (quoting *Arkansas Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.*, 947 F.2d 1341, 1343 n.1 (8th Cir. 1991)).

### A. *Boise Cascade*, *Willmar Electric*, and *Minnesota Associated Builders & Contractors*

Plaintiffs rely heavily on the Eighth Circuit's decision in *Boise Cascade Corp. v. Peterson*, 939 F.2d 632 (8th Cir. 1991), to argue that the state ratio requirement is "related to" an ERISA plan and therefore preempted by § 514(a) of ERISA. The facts in *Boise Cascade* were very similar to those in this case. There, the State of Minnesota adopted a rule regulating supervision ratios for journeymen and apprentice pipefitters on a jobsite. *Id.* at 635. The rule required that no more than one journeyman pipefitter was to supervise the first apprentice on a jobsite and that three journeymen pipefitters must supervise each additional apprentice on that jobsite. *Id.* at 634-35.

In *Boise Cascade*, the plaintiffs challenged the enforcement of the rule, arguing that the minimum jobsite ratio was preempted by ERISA. *Id.* at 635. The Eighth Circuit

found that the minimum jobsite ratio "related to" employee benefit plans covered by ERISA within the meaning of § 514(a) and was therefore preempted. *Id.* at 637.

While *Boise Cascade* may at first appear to be controlling authority given the similar factual scenarios and legal issues presented in the two cases, three Supreme Court cases interpreting § 514(a) of ERISA have been decided since *Boise Cascade*; these cases call into question the continued precedential value of *Boise Cascade*. Because the Supreme Court cases of *Travelers*,[9] *Dillingham*,[10] and *DeBuono*[11] include a more limited interpretation of the ERISA preemption clause, the Court is persuaded that *Boise Cascade*, while not having been explicitly overruled, is no longer an accurate gauge of ERISA preemption law. Instead, the Court believes that the recent Tenth Circuit analysis in *Willmar Electric Serv. Inc. v. Cooke*, 212 F.3d 533 (10th Cir. 2000), *cert. denied* 121 S. Ct. 428 (Nov. 6, 2000), is more reflective of the current Supreme Court view of § 514(a) of ERISA.

In *Willmar Electric*, the Tenth Circuit addressed the very same question faced by the Court here. In that case, the plaintiff was a multi-state contractor that performed electrical work in Colorado and other states. *Id.* at 534. It employed both licensed and unlicensed electricians and maintained a regular training program in which its apprentice

---

[9] *New York State Conf. of Blue Cross and Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995).

[10] *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316 (1997).

[11] *De Buono v. NYSA-ILA Med. & Clinical Serv. Fund*, 520 U.S. 806 (1997).

electricians were required to participate. *Id.* Like the apprenticeship program at issue here, the apprentices in that case were required to complete both on-the-job training and classroom training or "formal education." *Id.* The apprentices were required to complete 100 hours of classroom education each year. *Id.* In addition, the training program in *Willmar Electric* also utilized the "Wheels of Learning" curriculum and was funded through contributions to trust funds maintained by a foundation similar to the one in this case.[12] *Id.*

A Colorado statute required that an unlicensed electrical worker be supervised by no more than one licensed electrician at a jobsite. *Id.* at 535. The Colorado State Electrical Board issued a citation to Willmar Electric for violating the state ratio requirement. *Id.* Willmar Electric challenged the statute in federal court seeking declaratory and injunctive relief. *Id.*

The Tenth Circuit concluded that the Colorado statute was not preempted by ERISA. *Id.* at 539. The court explained that apprenticeship training standards are matters of traditional state regulation and that the supervision ratio at issue in the case was a matter related to occupational and public safety, another matter traditionally regulated by the states. *Id.* at 537. The court also noted that the subject of the Colorado law was not within the area of ERISA's concerns and that nothing in ERISA's legislative

---

[12] The Court explicitly concluded that "Willmar's apprenticeship program and training program is an employee welfare benefit plan covered by ERISA." *Willmar Electric Serv., Inc.*, 212 F.3d at 535.

history suggested that Congress intended to preempt such apprenticeship training standards. *Id.*

The Tenth Circuit specifically distinguished *Boise Cascade* and one other case,[13] explaining that "these cases are not persuasive because they preceded the Supreme Court's delineation of the limits of ERISA preemption cases such as *Travelers*, *Boggs*, *Dillingham*, and *DeBuono*." *Id.* The court further commented that *Boise Cascade* did not take into consideration *Dillingham's* conclusion that the objectives of ERISA were not thwarted by state regulation of "substantive apprentice training standards." *Id.* The court therefore concluded that "we cannot consider them to be reliable authorities on the question." *Id.*

The Tenth Circuit also rejected two arguments similar to those made in this case by Wright Electric. The court rejected Willmar Electric's argument that the Colorado law "related to" an ERISA plan because it created an artificial limit on the number of apprentices that could be trained. *Id.* at 538. The court also rejected Willmar Electric's argument that the state law invaded the federal province by dictating the ratio that must be used in the training program. *Id.* The court explained that the "Colorado law neither mandates nor limits the granting of benefits to employees" and "is neutral in that it applies with equal force to ERISA and non-ERISA plan training of apprentices." *Id.* The Tenth Circuit concluded that "[w]e find it implausible that Congress could have intended

---

[13] *Associated Builders and Contractors v. Perry*, 817 F. Supp. 49 (E.D. Mich. 1992).

for such a regulation to be superseded by ERISA merely because its application has some impact on an ERISA plan."[14] *Id.*

The Eighth Circuit ratified the reasoning of *Willmar Electric* in the recent case of *Minnesota Chapter of Assoc. Builders & Contractors, Inc. v. Minnesota Dept. of Pub. Safety*, 267 F.3d 807 (8th Cir. 2001) ("*Minnesota ABC*"). In that case, the court held that a Minnesota law, the Minnesota Sprinkler Fitter Statute (the "Sprinkler Statute"),[15] and its implementing regulations were preempted by ERISA. *Id.* at 820. The Sprinkler Statute and its regulations prohibited fire protection contractors from employing people who were not registered apprentices, and prescribed detailed rules for the management of apprenticeship programs, including "the length of an apprenticeship program, responsibilities of the apprentice, how an apprentice should be supervised, schedule of work processes, wage schedules, the amount of hours of related instruction required and the hours of work required." *Id.* at 814. The court determined that this mandatory language did more than merely put economic pressures on apprenticeship programs, but rather prevented training that did not conform to the statute and "dictate[d] the choices" facing apprenticeship programs. *Id.* (citation omitted). The court then contrasted the Sprinkler Statute with the Colorado statute at issue in *Willmar Electric*. *Id.* at 815. The

---

[14] The Tenth Circuit also rejected a third argument made by Willmar Electric that preemption was necessary because the state law interfered with the uniform administration of benefit plans. *Id.* at 539. The court acknowledged that different apprenticeship standards could have some effect on the administration of Willmar Electric's benefit plan, but concluded that "this is not enough to overcome the presumption that Congress did not intend to supersede state regulation of this area of law." *Id.*

[15] Minn. Stat. § 299M.04.

court noted that the Colorado law was one of general applicability, which merely placed an economic burden on apprenticeship programs. *Id.* at 815. The "key distinction," the court stated, is that the Colorado law "does not prevent training, but [merely] increases the cost associated with doing so." *Id.* (quoting *Willmar Electric*, 212 F.3d at 538 n.3). Thus, the Eighth Circuit approved of *Willmar Electric*'s reasoning, while distinguishing that case from its holding that the Minnesota Sprinkler Statute was preempted.

**B. The Minnesota State Law Has No "Connection With" an ERISA Plan**

The Minnesota ratio requirement at issue in the present case is very similar to the Colorado law in *Willmar Electric*. This Court finds the reasoning in *Willmar Electric* and its ratification by *Minnesota ABC* persuasive, and concludes that the Minnesota ratio requirement would not be preempted by ERISA, even if the Wright Electric apprenticeship program was considered an ERISA plan.

Plaintiffs argue that the Minnesota law should be preempted because it dictates the terms of an ERISA plan, rather than simply having an economic influence on an ERISA plan. The Court cannot agree. Unlike the Sprinkler Statute in *Minnesota ABC*, for instance, the Minnesota ratio requirement for unlicensed electricians does not mandate a particular structure or administrative scheme for Wright Electric's apprenticeship program. *See Minnesota ABC*, 267 F.3d at 815. The ratio requirement does not bind the plan administrators to a particular choice, but instead simply exerts an indirect economic influence on the plan. *See Travelers*, 514 U.S. at 659 (explaining that "indirect economic influence" did not "bind plan administrators to any particular choice and thus function as

a regulation of an ERISA plan itself"); *Minnesota ABC,* 267 F.3d at 815, (stating that indirect economic influence alone does not warrant a finding that Congress intended to preempt an area traditionally regulated by the states) (quoting *Willmar Electric*, 212 F.3d at 538). The Minnesota state law may have the indirect impact of forcing Wright Electric to hire more journeymen electricians to supervise apprentices, or it may require Wright Electric to rethink the way that work projects are assigned, but the law simply does not bind the plan administrators to any particular choice regarding apprenticeship training. *Cf. Minnesota ABC*, 267 F.3d at 814-15 (describing how the preempted Sprinkler Statute binds plan administrators). The Minnesota ratio requirement in no way prohibits Wright Electric from providing the identical plan benefits that are currently offered – 1500 hours of on-the-job training and 144 hours of classroom training. Wright Electric is not required to change the funding of its plan in anyway. Moreover, the ratio requirement is a neutral state law that applies equally to all electrical workers, regardless of whether they are part of an ERISA plan. As a result, the ratio requirement does not dictate the terms of an ERISA plan, but only exerts a permissible indirect economic influence.

Furthermore, the Minnesota supervision ratio is intended to protect the health and safety of workers and the public, an area that is clearly within the traditional domain of state regulatory authority. *DeBuono*, 520 U.S. at 814 ("the historic police powers of the state include the regulation of matters of health and safety"); *Dillingham*, 519 U.S. at 330 ("apprenticeship standards . . . have long been regulated by the States"); *Willmar Electric Serv. Inc.*, 212 F.3d at 537 ("[t]he appropriate degree of supervision required for apprentices performing electrical work is a matter related to occupational and public

safety and, as such, has traditionally been subject to the state's police powers"). As the Supreme Court has explained, the "historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Travelers*, 514 U.S. at 654-55. In this case, plaintiffs therefore "bear the considerable burden of overcoming 'the starting presumption that Congress did not intend to supplant state law.'" *DeBuono*, 520 U.S. at 814 (quoting *Travelers*, 514 U.S. at 654). Because the Court cannot find any indication in the legislative history of ERISA that it was intended to preempt health and safety regulations applicable to apprenticeship training standards, the Court concludes that the Minnesota ratio requirement is not preempted by ERISA. *Dillingham*, 519 U.S. at 331 ("[g]iven the paucity of indication in ERISA and its legislative history of any intent on the part of Congress to preempt state apprenticeship training standards . . . we are reluctant to alter our ordinary 'assumption.'").

### C. Application of the Shea Factors

As noted above, the Eighth Circuit has articulated a list of seven factors that courts are to consider in determining whether a state law has a connection with an ERISA plan. *Shea*, 208 F.3d at 718. Applying those factors to facts in this case further convinces the Court that the Minnesota ratio requirement is not preempted by ERISA.

First, the ratio requirement does not negate any provision of Wright Electric's apprenticeship program. *Shea*, 208 F.3d at 718. There is no type of supervision or ratio requirement contained in the Wright Electric apprenticeship program and therefore no

provision to be negated. This first factor therefore weighs against finding that the state law is preempted.

Next, the state law has little affect on the relations between primary ERISA entities or on the structure of the Wright Electric apprenticeship program. *Arkansas Blue Cross & Blue Shield*, 947 F.2d at 1346 (treating "these two factors as identical"). As explained above, the ratio requirement does not alter Wright Electric's actual apprenticeship training program. It does not dictate the number of training hours nor does it alter the training methodology or training components of Wright Electric's program. The state ratio requirement only affects the relations between the employer and plan beneficiaries by ensuring that no more than two unlicensed workers are supervised by one licensed journeyman electrician, an area that is not even explicitly addressed in Wright Electric's apprenticeship program. The minimal affect that the state law has on relations between ERISA entities and the fact that the state law does not affect the structure of the apprenticeship program therefore also weigh against finding that the ratio requirement is preempted.

The fourth factor in the analysis is whether the state law impacts the administration of ERISA plans. *Shea*, 208 F.3d at 718. This factor weighs slightly in favor of preemption. The state law will minimally impact the administration of the Wright Electric plan by requiring the company to monitor and document compliance with the supervision ratio.

The fifth factor, whether the state law has an economic impact on ERISA plans, also slightly favors preemption. The state law does not appear to have any direct

economic impact on the Wright Electric apprenticeship program. However, there is the potential for some indirect economic impact on the plan. Wright Electric may be forced to alter the number of journeymen electricians that are sent to work on a particular project to ensure that the supervision ratio is met. This may necessitate that more journeymen electricians be hired or that Wright Electric alter the way in which it assigns electricians to particular jobs. However, as noted above, there is no direct economic impact in this case. The state law does not dictate the method of training or the hour requirements that apprentices must meet, nor does it dictate the benefits that can be extended to apprentices under the plan.

The Court also sees no reason why preemption would be supported or undermined by any other specific provision of ERISA. *Wilson*, 114 F.3d at 719. This factor is therefore neutral.

The last factor in the analysis is whether the state law is an exercise of traditional police power. This factor weighs strongly against preemption. The state law supervision requirement is intended to protect both unlicensed electrical workers and the public. The statute and corresponding rule are occupational safety regulations. This is an area that has long been one in which the state is given broad discretion to regulate. *DeBuono*, 520 U.S. at 814; *Dillingham*, 519 U.S. at 330. Accordingly, this factor weighs strongly against preemption.

Having considered and weighed each of the *Shea* factors, the Court concludes that the state law would not be preempted in this case, even if the Court were to determine that Wright Electric's plan was an ERISA plan. Only two of the seven factors, the effect

of relations between ERISA entities and the economic impact on the plan, weigh slightly in favor of preemption. Of the remaining factors, one is neutral and the other four weigh against finding preemption. Moreover, the fact that the state law is intended to protect public and worker safety and is an area of traditional state regulation weighs very strongly against preemption.

In reaching this conclusion, the Court emphasizes its belief that a health and safety regulation concerning apprenticeship programs is not the type of state law that Congress intended to preempt when enacting ERISA. *Dillingham*, 519 U.S. at 330 ("substantive standards to be applied to apprenticeship training programs are . . . quite remote from the areas with which ERISA is expressly concerned"). The law in no way affects disclosure, reporting or fiduciary requirements – the main concerns for which Congress enacted ERISA. *Id.* at 330-31. Unlike the far more intrusive statute in *Minnesota ABC*, the state law here has an extremely tenuous and indirect impact on Wright Electric's apprenticeship program, and preemption is not warranted. Defendants' motion for summary judgment is therefore granted.[16]

[16] Because the Court is granting defendants collective motion for summary judgment it need not reach the separate issues raised by Richard Bradley in his motion for summary judgment.

## ORDER

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' motions for summary judgment [Docket Nos. 24 & 47] are **GRANTED**.

2. Defendant Bradley's motion for summary judgment [Docket No. 32] is **MOOT.**

3. Plaintiffs' motion for summary judgment [Docket No. 37] is **DENIED**.

4. Plaintiffs' Complaint is **DISMISSED** with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 31, 2002
at Minneapolis, Minnesota.

John R. Tunheim
JOHN R. TUNHEIM
United States District Judge